**GIRDLER CORPORATION v. E. I. DU-PONT DE NEMOURS & CO.**

Civ. No. 414.

District Court, D. Delaware.

March 23, 1945.

See, also, 56 F.Supp. 871.

Charles H. Walker (of Fish, Richardson & Neave), and Clair W. Fairbank (of Dean, Fairbank & Hirsch), all of New York City, Virgil E. Woodcock, of Philadelphia, Pa., and James R. Morford (of Marvel & Morford), all of Wilmington, Del., for plaintiff.

Albert T. St. Clair, Chester Biesterfeld, and Morris, Steel & Nichols, all of Wilmington, Del., for defendant.

LEAHY, District Judge.

Plaintiff sues for declaratory judgment that defendant's Pitman Reissue Patent No. 22,301 is invalid. Defendant counterclaimed, charging contributory infringement. The matter is here on summary judgment on a single issue. Argument on the pleadings, affidavits and depositions.

Defendant's original patent was issued July 20, 1937, on an application filed October 30, 1935. The rule of the patent is concerned with the use of high-frequency electric heating apparatus to "activate" or "energize" adhesive cement used in joining "surfaces" together. In particular, the patent refers to joining parts of human footwear; but general applicability to heavy leather belting, plywood, wall board and safety glass is also mentioned. The specification concludes its discussion of suitable materials by stating "other applications in diversified arts where two or more materials are laminated will be obvious." The process disclosed relates to coating materials with suitable cement, placing them in a press between electrodes of high-frequency electric heating apparatus, causing the cement to set.[1] There are two typical claims. Claim 24, the broadest,

---

[1] P. 2, col. 1, lines 18–39: "When it is desired to join the coated parts, for example, shoe sole and the upper parts, they are assembled in a suitable pressure device modified however with high frequency electrical equipment as described. The cement is then activated by applying electrical energy in the form of high frequency current around the unit in such a manner that heat is induced in the cement film, causing thermal softening to the extent that the composition becomes tacky. The unit is then cooled while maintaining the original pressure, thus causing the cement to set-up and form a strong durable joint. The broader aspects of the invention contemplate also the elimination of volatile solvents from cements which are activated by this means. The desired results are accomplished in the same manner; that is, by generating the necessary heat in the cement containing solvents through the medium of an ener-

reads: "A process for joining a plurality of parts with an adhesive, comprising heating the said adhesive by subjecting it to a high frequency electric field so as to energize the adhesive, thereby causing the parts to adhere." Claim 12 reads: "The process of joining surfaces which comprises placing the surfaces to be joined together, with a film of adhesive therebetween and placing the composite parts between two plates of a condenser connected to a source of electrical current having a frequency above 100,000 cycles, per second."[2]

Plaintiff's original motion for summary judgment was based upon several grounds; and while practically all of these grounds were urged by plaintiff at the argument for summary judgment, the argument was restricted to the ground appearing in paragraph 7(d) of plaintiff's motion. The ground reads: "It [the Reissue Patent] is for a different alleged invention from that of the original patent of which it purports to be a reissue."

1. The statute[3] governing reissue patents has been most recently construed by the Supreme Court in U. S. Industrial Chemicals, Inc. v. Carbide & Carbon Chemical Corp. (Mr. Justice Roberts), 315 U.S. 668, 62 S.Ct. 839, 844, 86 L.Ed. 1105. The patent there involved the process of producing ethylene oxide. The reaction called for the introduction of water by an operator, in contradistinction to the formation of water as a by-product of the reaction. After the patent issued, it was observed that reaction occurred without the addition of water as taught by the original patent. The rule of the reissue patent stated that, in addition to that formed by the reaction, water might be added if desired.

In short, water addition in the original patent was mandatory; in the reissue it was permissive. Both inferior courts sustained the patent. The Supreme Court, holding the reissue patent invalid because it was not for the same invention, said: "As the Circuit Court of Appeals held, the original specification and claims treated the voluntary introduction of water into the reaction chamber as a necessary step in the process whereas such introduction is made permissive by the reissue. We agree with that court's view that there is thus a difference between the procedure described in the two documents. But we cannot agree with its conclusion that the difference is so insubstantial as not to invalidate the new claims 8 and 9. On the face of the papers the process described in the original patent included a step not designated as optional or desirable but described and claimed as an integral part of the whole operation. In contrast, the reissue treats this step as immaterial and mentions the introduction of water as for the mere purpose of controlling the temperature in the reaction zone—a thought not even suggested by the specification of the original patent which, on the contrary, in its very first sentence, speaks of the simultaneous action of the oxygen of air and of water. * * * We hold that the reissue is not for the same invention described and claimed and intended to be secured by the original patent and is, therefore, void. * * * This dispute must be resolved by a comparison of the disclosures of the two instruments. If that comparison leads to the conclusion that the reissue is not for the same invention as the original, the reissue is void as not within the terms of the statute."

---

gized field set up around the area by high frequency electrical current."

[2] There is no pretention of invention of high-frequency apparatus as Allcutt (of Westinghouse) had covered this device in 1925. See Allcutt Patent No. 1,1,555,-258.

[3] R.S. § 4916, 35 U.S.C.A. § 64 states: "Whenever any patent is wholly or partly inoperative or invalid, by reason of a defective or insufficient specification, or by reason of the patentee claiming as his own invention or discovery more than he had a right to claim as new, if the error has arisen by inadvertence, accident, or mistake, and without any fraudulent or deceptive intention, the commissioner shall, on the surrender of such patent and the payment of the duty required by law, cause a patent for the same invention, and in accordance with the corrected specification, to be reissued to the patentee or to his assigns or legal representatives, for the unexpired part of the term of the original patent. * * * The specifications and claims in every such case shall be subject to revision and restriction in the same manner as original applications are. Every patent so reissued, together with the corrected specifications, shall have the same effect and operation in law, on the trial of all actions for causes thereafter arising, as if the same had been originally filed in such corrected form; but no new matter shall be introduced into the specification * * * ."

2. Cridlebaugh v. Rudolph (Judges Biggs, Jones and Goodrich), 3 Cir., 131 F.2d 795, 799, following the U. S. Industrial Chemicals, Inc. v. Carbide & Carbon Chemical Corp. case, supra, was concerned with fowl blinkers intended to prevent birds from picking one another. The blinkers consisted of two plates, one on each side of the beak, fastened by a pin passing through the fowl's breather openings. The reissue claims referred to the pivotal function of the retaining pin which was not claimed in the original patent. The holding of invalidity was because both patents were not for the same invention. It was stated: "Patent Office decisions relevant to the existence of grounds for a reissue, when based on disputed questions of fact, are of course conclusive. But where it is apparent from the face of the records that no ground for reissue existed, the courts may so rule as a matter of law. * * * Whether the original patent was 'wholly or partly inoperative or invalid' and whether the reissue is for the 'same invention' are matters for the court to determine upon examination of the original and the reissue patents. * * * The exaction of the requirement that an original patent and a reissue must cover one and the same invention was clearly indicated in the recent case of United Industrial Chemicals, Inc. v. Carbide & Carbon Chemicals Corp., 315 U.S. 668, 676, 62 S.Ct. 839, 843, 86 L.Ed. 1105. There Mr. Justice Roberts said that 'If there be failure of disclosure in the original patent of matter claimed in the reissue, it will not aid the patentee that the new matter covered by the reissue was within his knowledge when he applied for his original patent. And it is not enough that an invention might have been claimed in the original patent because it was suggested or indicated in the specification. It must appear from the face of the instrument that what is covered by the reissue was intended to have been covered and secured by the original.' It follows therefore that the reissue patent here involved is invalid."

3. Defendant insists it has narrowed its claims and that a presumption exists that its reissue patent has been granted for the "same invention". Defendant's direct reliance is on Gilbert Spruance Co. v. Ellis-Foster Co. (Judges Biggs, Clark and Buffington), 3 Cir., 114 F.2d 771. There, claims 3, 4, 5, 11 and 16 of the original read on monobasic carboxylic acids. The reissue was limited to five specified dibasic acids using the language "organic carboxylic acid selected from the group consisting of plithalic, malcic, fumacic, malic and succinic acids." It was held that the changes in the reissue excluded all monobasic acids, a tribasic acid (citric) and a dibasic acid (tartaric) as well as any undisclosed polybasic acids other than the five recited in the reissue. The reissue was manifestly a definite limitation of claims involving the same invention.

4. The claims changed, in the case at bar, were 1, 8–13, and 24–27. Depending upon these changes other claims were indirectly changed, i. e., 2–7 (depending upon claim 2), 14–18 (depending upon claim 13), 23 (depending upon claim 8), and 28 (depending upon claim 12). Claims 19–22 were unchanged.

Claim 19 is concerned with use of high-frequency current for making shoes under specific conditions. Claim 20 is directed to the high-frequency bonding of materials (unlimited) in which part of the press is a "yielding bed". Claims 21 and 22 are concerned with the making of shoes where part of the press is a "yielding bed" (21) or an "inflatable bag" (22). If the changed claims are held invalid because for a different invention, the unchanged claims are not affected by such a decision.

The basic changes made in the reissue were: (a) the original lower limit of range of cycles "above 100,000 cycles per second" was changed to "at least about 600,000 cycles per second"; (b) the original inclusion of "safety glass" under the invention was deleted; and (c) whereas the original claims covered materials without limitations, i. e., leather and wood (organic) and safety glass (inorganic), the reissue covers merely "organic" materials. The claimed invention involves a process for joining surfaces by placing the surfaces to be joined together with a film of adhesive and then placing the parts between the plates of a condenser connected to a source of high-frequency current, providing it be above 100,000 cycles per second. While the specification speaks generally of joining "surfaces", particularization is made to the cementing of shoe parts, and to other things such as the manufacture of heavy leather belting, the lamination of wood, the fabrication of wall board, and safety glass. But the specifications and claims reach out to cover all "surfaces", including inorganic as well as organic materials,

and "other application in diversified arts", in addition to those just specified "where two or more materials are laminated will be obvious." It would appear, then, that the invention intended to be for the use of high-frequency electric heat for use in cementing all "surfaces" regardless of the kind of surfaces or the range of frequencies.

The narrow question finally presents itself—are the reissue claims invalid because they define a different invention from that covered by original Pitman, or does the reissue simply represent a limitation of claims on the same invention? Either U. S. Industrial Chemicals, Inc. v. Carbide & Carbon Chemical Corp. and Cridlebaugh v. Rudolph, supra, control or the changes appearing in the reissue call for the application of Gilbert Spruance Co. v. Ellis-Foster Co., supra. We think the Supreme Court case and this Circuit's later opinion in Cridlebaugh v. Rudolph are applicable. The reissue is concerned with a "surface" which can only be of organic materials; the invention is not to include safety glass; and while a frequency "above 100,000 cycles per second", appearing in the original patent, may mean 600,000, or 200,000 or 300,000, "at least about 600,000 cycles per second", appearing in the reissue, cannot by any rule of construction mean other than a minimum of 600,000 and not 300,000, 200,000 or 100,000. The claim of an original patent may be narrowed by reissue; but by doing so claims may not be made to cover a different invention. Pitman's original claims teach that almost any frequency at all in the hundreds of thousands, commencing at 100,000 cycles per second up to as high as 100,000,000 cycles per second, may be used. Explanation of the change of frequency is that "The omission of a definition of 'high frequency' was due to an inadvertence." We think the reissue contains new matter insofar as it purports to define a particular range of frequency to serve as a basis for a change in the claims. It would appear discovery of the frequency at 600,000 cycles per second is to have some special merit; in the original patent no significance is attached to the figure "600,000" nor to any particular frequency. In short, the original patent treated frequency as no part of the invention. It is not that the boundaries of frequency are different, but the inventive act to which Pitman points as justification for the reissue is different. In the reissue

patent he states that his was the discovery that organic substances could be joined provided you use current of a specific range, i. e., above at least 600,000 cycles per second. Pitman has drawn a line where no line existed before. Our conclusion is that the reissue covers an invention different from that originally claimed.

Let an order on plaintiff's motion be granted.