HELENE CURTIS INDUSTRIES, Inc., and Helene Curtis Sales, Inc., Plaintiffs-Appellees,

C. V. Layden, doing business as Southwestern Beauty Products Company, Plaintiff-Intervener,

v.

SALES AFFILIATES, Inc., Defendant-Appellant.

The GILLETTE COMPANY, Plaintiff-Appellee,

Skillern & Sons, Inc., and Walgreen Drug Company of Texas, Plaintiffs-Interveners-Appellees,

v.

SALES AFFILIATES, Inc., Defendant-Appellant.

SALES AFFILIATES, Inc., Plaintiff-Appellant,

The Procter & Gamble Company, Involuntary Plaintiff,

v.

C. V. LAYDEN, doing business as Southwestern Beauty Products Company, Defendant-Appellee.

SALES AFFILIATES, Inc., Plaintiff-Appellant,

The Procter & Gamble Company, Involuntary Plaintiff,

v.

SKILLERN & SONS, Inc., Walgreen Drug Company of Texas, and The Gillette Company, Defendants-Appellees.

Nos. 189–192, Dockets 23185–23188.

United States Court of Appeals Second Circuit.

Argued March 9, 1955.

Decided April 9, 1956.

150

Kenyon & Kenyon, New York City
(Theodore S. Kenyon, New York City,
Maurice S. Cayne, Chicago, Ill., and Mal-
vin R. Mandelbaum, New York City, of
counsel), for Helene Curtis Industries,
Inc., Helene Curtis Sales, Inc., and C. V.
Layden, d/b/a Southwestern Beauty
Products Co.

Henry R. Ashton, New York City (Edgar H. Kent, Boston, Mass., Rynn Berry, New York City, and Martin Kirkpatrick, Boston, Mass., of counsel), for Gillette Co.

Hawkins, Delafield & Wood, New York City (Clarence Fried, New York City, of counsel), for Skillern & Sons, Inc., and Walgreen Drug Co. of Texas.

Morgan, Finnegan, Durham & Pine, New York City (George B. Finnegan, Jr., New York City, William D. Denson, Washington, D. C., and Jerome G. Lee, New York City, of counsel), for Sales Affiliates, Inc.

Before MEDINA and HINCKS, Circuit Judges, and BURKE, District Judge.

HINCKS, Circuit Judge.

These four appeals all involve the validity and infringement of United States Patent No. 2,577,710 which issued to McDonough on December 4, 1951 on an application dated June 16, 1941. The appeals are brought from four decrees of the District Court for the Southern District of New York, in each of which, on a considered opinion reported in 121 F. Supp. 490, it was adjudged that the patent in suit was invalid. The decrees were entered in four suits which had been consolidated for trial and referred to Honorable Simon H. Rifkind as Special Master for report together with his findings of fact and conclusions of law. Two of these suits were actions brought for the infringement of the patent in suit by Sales Affiliates, Inc. against several defendants; the other two were actions for declaratory judgments brought against Sales Affiliates, Inc., seeking a declaration of validity and non-infringement. For purposes of this opinion, we will hereinafter refer to the parties by the terminology used by the Master and the court below, using the designation of "plaintiffs" to refer to the parties collectively attacking the patent and "defendant" to refer to Sales Affiliates, the equitable owner of the patent.

■ Although the patent in suit as issued contained 18 claims, all of which were dealt with below, the defendant on brief states: "For the purpose of this appeal, appellant stands on Claims 2, 12, 17 and 18." We take this to be a concession that as to the other claims in suit below, the decree may be affirmed. We shall, therefore, focus our attention on these four claims.

We turn first to consider the scope of the invention claimed. The patent relates generally to a chemical composition suitable for permanent hair waving. The inventor's objective, as stated in the patent specifications, was a composition as effective and as rapid, even when applied without heat, as the sulfides used by the prior art, but free from the bad odor and toxicity characteristic of the sulfides. In his specifications the patentee says "I have discovered that I can obtain these objects [*sic*] by providing as a waving agent a mercaptan or mixture of mercaptans * * * and that an effective waving solution can be obtained by proper formulation including a mercaptan in water." And the specifications further recite discovery (1) that mercaptans become less effective as their molecular weight increases, stating by way of "Example" that a specified mercaptan having a molecular weight of 77 "is far more efficient as a waving agent than cysteine (molecular weight 121)"; (2) that both the polar and non-polar mercaptans function satisfactorily when used in solutions having a concentration of "usually less than 15%"; (3) that they "are especially effective when the pH range is from 7.0 to 10.0, the preferred range being about 9.2"; and (4) that to produce the desired alkalinity, alkaline materials "are particularly effective with less hair destructive effect" if they have "a dissociation constant less than $5 \times 10^{-3}$ and preferably about $10^{-5}$."

The claims relied on all assert a permanent waving composition in which, whether applied with or without heat, a mercaptan is the waving agent and, in each of the four claims all four of the "discoveries" listed serially above are included as limiting factors. Thus in each the mercaptan is limited to one hav-

ing a molecular weight of "less than 121" and in all four the dissociation constant of the alkaline base is that stated in the specifications to be "particularly effective." The alkalinity of the solution is, respectively, limited to that "ranging from about pH 9.2 to not higher than 9.5" (Claims 2 and 12); to "about pH 9.2" (Claim 17); and to "higher than pH 7 and not higher than pH 9.5" (Claim 18). The concentration of the mercaptan solution is variously stated as "3% to less than about 8%" (Claims 2 and 12); as "1% to about 10%" (Claim 17); and "about 6%" (Claim 18).

 In his penetrating analysis of the claimed invention, the Master wrote as follows:

"It is of course elementary in the patent law that generic claims, such as involved in the present patent, cannot survive where a species within the claimed genus has been invented, known or used by others prior to the patentee's date of invention. 'A generic monopoly must rest upon a generic discovery.' Metals Recovery Co. v. Anaconda Copper Mining Co., 9 Cir., 1929, 31 F. 2d 100, 103. Prior invention, disclosure or use of a species anticipates the genus. In re Steenbock, 1936, 83 F.2d 912, 23 C.C.P.A., Patents, 1244; Application of Kyrides, 1947, 159 F.2d 1019, 34 C.C.P.A., Patents, 920.

"That McDonough was not the first to discover the usefulness of mercaptans as permanent waving agents or hair softeners is clear beyond peradventure. The U. S. Patent No. 2,201,929, to Speakman, issued May 21, 1940, on an application dated December 9, 1935, specifically disclosed and claimed a method of permanently waving hair in which the waving agent is cysteine hydrochloride, a mercaptan salt, in an alkaline solution of at least pH 10.

"And so here, defendant posits invention not on the broad generic discovery of mercaptan waving lotions, but rather on the discovery that special laws and criteria govern mercaptans in hair waving.

\* \* \* \* \* \*

"In more conventional patent terminology, the invention on which these claims may be said to rest, is the discovery that certain *critical* limits exists for mercaptan waving. Indeed, the law of criticality has been the battlefield upon which much of the present contest has been waged with seemingly irreconcilable views as to the meaning of the term and its applicability to the facts at hand.

"The term 'criticality' as used in the patent sense is not synonymous with invention, but rather, more precisely, is a device for determining the presence or absence of invention. The question always is whether the inventive act is of sufficient magnitude to justify the extension of a legal monopoly for the matter covered by the claims. And in determining whether a patentable invention is present, certain rules have been formulated, among which is that of criticality. Thus, as has frequently been said, the mere location of the optimum conditions of use for a known composition of matter does not constitute 'invention' so as to entitle the discoverer thereof to a monopoly. That objective, however useful the final result, can be achieved by 'patient experiment', see Wallace v. F. W. Woolworth Co., 2 Cir., 133 F.2d 763, 764, certiorari denied 1943, 320 U.S. 739, 64 S.Ct. 40, 88 L. Ed. 438; no inventive genius is necessary. Rather, it is only where, other requisites being present, the patentee has found a point or points at which some result differing in kind—and not merely in degree— from the results achieved by the prior art, that an inventive act may be said to exist. At least for this Circuit, the Court of Appeals has summarized the rule in definite terms. In Kwik Set, Inc., v. Welch Grape Juice Co., 2 Cir., 1936, 86 F. 2d 945, 947, it said:

" 'A patentee may not arbitrarily select a point in a progressive change and maintain a patent monopoly for all operations in that progressive change falling on one particular side of that arbitrarily selected point. It is only where the selected point corresponds with the physical phenomenon and the patentee has discovered the point at which that physical phenomenon occurs that the maintenance of a patent monopoly is admissible.' " [1]

This analysis was accepted by the court below, and, except for the applicability of the Kwik Set case, has not been questioned by the defendant on this appeal. We, too, accept it not only as a correct statement of the law generally applicable but also as broadly stating the scope of the patentable subject-matter in a sub-generic discovery such as is here involved.

### Disclosure of Criticality

It was held below that under 35 U.S.C.A. § 112 the patent was invalid for lack of disclosure that any one of the four limiting factors listed above was a "critical" limitation. As to this, we hold that a disclosure which teaches that a limitation is critical is enough to satisfy § 112 even though the limitation is not expressly stated to be "critical." We think it plain that even to one skilled in the art the reference to a mercaptan *concentration* as "usually less than 15%" would not teach that the limit stated marked a difference in phenomenon. Similarly, nothing in the specifications relating to the molecular weight of the selected mercaptan teaches "less than 121" is a critical limit. Nor, we think, do the specifications teach a *critical range* for the dissociation constant of the alkaline base. So far, we sustain the holding below. But we cannot sustain the holding that the specifications failed to teach that there was anything critical about the pH of the described solution.

The specifications speak of a pH range of 7 to 10. They first say that this range is "especially effective" and later refer to it as the "desired range." Then the specifications go on to say:

"This pH range is particularly critical when the waving agent is used for that type of waving employing a chemical setting agent, as in the so-called 'cold waving' method, since in that system the necessary requirement of speed without hair destruction demands a high concentration of the waving agent in the waving solution. If the pH value is not high enough slow waving action will result and if too high the hair will be destroyed or badly damaged. While with sulfite a shorter waving time may require a pH of 10 or above, with these more powerful waving agents, the use of pH's higher than 9.5 must be watched very carefully for with pH of 10 or above, hair destruction or injury may occur before a satisfactory wave is obtained."

We agree that this passage, in saying that if the pH value "is not high enough slow waving action will result" does not teach that pH 7 is a critical low limit of the range: the language used does not import any difference of phenomenon below pH 7 but suggests at most a difference in the degree of the speed of the wave. So far, we agree, there was no disclosure of criticality. But in saying that "if too high the hair will be destroyed or badly damaged" we think the specification does teach that the high limit of the range, pH 10, is critical. It teaches that above that limit the solution will have a different and damaging reaction on the hair. And that teaching, though somewhat weakened, we think not wholly nullified by the subsequent clause in the passage quoted, on which the Master largely relied, saying "hair destruction or injury *may* occur before a satisfactory wave is obtained."

1. As the Master noted, the Kwik Set case was cited with apparent approval in Dow Chemical Co. v. Halliburton Co.,

324 U.S. 320, 329, 65 S.Ct. 647, 89 L.Ed. 973.

We have then this situation. The patent, as we read it, teaches that a pH ceiling of 10 is a critical limitation: it does *not* teach that a pH floor of 7, or a floor of any pH lower than 10, is a critical limitation. As a result, we hold, the patent, if it survives attacks on its validity on other grounds, is not invalid because of a complete failure to disclose criticality. It discloses an invention comprising all the specified solutions which have a pH characteristic of less than 10.

### Criticality in Fact

■ We turn next to appraise the proofs on which the plaintiffs rely for their contention that none of the limitations disclosed in the patent, including the limitation to a pH 10 ceiling, are in fact critical. That the criticality of pH *10* is the crucial problem is not altered by the fact that the applicant chose to limit his claims to solutions having a lower pH characteristic than 10. For a patentee may so state his claims, which will measure the scope of his monopoly, as to include only a portion of his disclosed invention and abandon the remainder to the public.[2]

■ The defendant argues strenuously that the criticality of pH 10 must be tested by the commercial requirements of the tightest curl values without damage in the shortest time. Thus defendant's position is predicated on the premise that criticality may be based solely on commercial superiority. This contention we overrule on the authority of Kwik Set, Inc., v. Welch Grape Juice Co., 2 Cir., 86 F.2d 945, 947, which we now reaffirm. We hold that the applicable standard is one of physical (in this case, of chemical) phenomenon;—that a limitation is critical only if based on physical or chemical fact.[3]

It was found below that successful hair waving without damage to the hair could be accomplished by the use of mercaptan solutions having an alkalinity in excess of pH 10. That finding was based in part on the result of tests made by the plaintiffs' expert witness Brown.[4] These tests, it is true, indicated that solutions below pH 10 effected tighter curls. But we think that fact demonstrates not criticality at any particular degree of alkalinity but only that the optimum range lay somewhere below pH 10. The finding below had further substantial support from the evidence relating to tests made by the defendant which showed (1) a successful wave without hair damage by the use of a mercaptan solution of pH 10.2 and (2) tests resulting in hair damage with mercaptan solutions of pH 9.5 and even at pH 9.2. We hold this finding was supported by adequate evidence properly admitted.

■ The defendant, however, contends that Brown's tests were not admissible on the issue of criticality. It asserts that commercial practice in hair waving in 1941, when his application was made, was to wave by the "circulation" method and not by the "direct application" method used in Brown's tests. And so, the defendant argues, to test the criticality of McDonough's pH range by the direct application method was erroneously to apply a testing technique which postdated McDonough's invention date. We think the argument is fallacious in law. It is, of course, true that patentable invention must be measured by the advance which it teaches over the prior art. But in determining the existence or non-existence of such physical phenomena as demonstrate a critical advance over the prior art, we think the court is entitled to such aid as derives

---

2. United Chromium v. International Silver Co., 2 Cir., 60 F.2d 913, certiorari denied 288 U.S. 600, 53 S.Ct. 319, 77 L.Ed. 976.

3. Libbey-Owens-Ford Glass Co. v. Celanese Corp. of America, 6 Cir., 135 F.2d 138, 145–146; David Belais, Inc., v. Goldsmith Bros. Smelting & Refining Co., 2 Cir., 10 F.2d 673; Brady Brass Co. v. Ajax Metal Co., 3 Cir., 160 F. 84.

4. These tests also demonstrated the absence of criticality in the other factors which, under the claims, were imposed on the use of mercaptans.

from any relevant technique,—even one not developed until after the invention at issue.

It is not necessary, however, for us to rest our decision on the ground that the defendant's argument is unsound in law. It also lacks a basis on the facts. For in the field of hair waving, the "direct application" method, even though it may not have been the predominating commercial method in 1941, at least as early as 1940 had had substantial commercial vogue. It was the method of application used in "cold waving" by the so-called "Turban" wave system. It had been used with waving solutions as early as 1934. Its existence was attested in Speakman's Canadian Patent No. 365,-290,[5] issued April 6, 1937 on an application dated December 10, 1935. It also was reflected in Speakman's U. S. Patent No. 2,261,094, issued October 28, 1941 on an application filed December 7, 1935,[5] which disclosed along with other waving agents the mercaptan cysteine hydrochloride, and definitely taught cold waving by the direct application, as well as the circulation, method.

We are satisfied that the finding made below that the pH 10 ceiling was not critical in fact, was supported by ample evidence. Even more imperatively the proofs required a finding that a limitation to a pH floor of 7—if, contrary to our interpretation of the patent, that limitation had been disclosed as critical —was not in fact critical. Likewise as to other disclosed limitations such as that relating to the molecular weight of the selected mercaptans. At most, all these limitations disclosed some teaching—perhaps useful teaching—as to matters of degree affecting the use and selection of mercaptans in hair waving. But such teaching, we hold, did not rise to the level of patentable invention: it did not warrant a private monopoly over the preferred area of the previously disclosed genus of mercaptan hair waving.

The plaintiffs did not confine their attack on the validity of McDonough's claims to the proof of the non-criticality of the limitations stated in the claims. They contended below, and press their contentions on appeal, that the claims in other respects lack patentable invention. These contentions also were sustained, on the Master's recommendation, by the court below. We, too, will consider and rule on those grounds of the decision below. For purposes of our ensuing discussion, we will assume,—contrary to our holdings indicated above—that a pH range of 7 to 10 was both disclosed by the specifications as critical and was in fact critical.

■ The question of patentable invention depends upon the prior art existing at the invention date of the patent in suit. Consequently, we will preface our discussion of the problem as to invention by an examination of the holding made below that McDonough was not entitled to a preapplication invention date.

*McDonough's Invention Date*

■ The defendant contends that McDonough conceived his invention and reduced it to practice long prior to his application date which was June 16, 1941. It points to a memo by McDonough dated September 12, 1935 in which it was noted that "cysteine even at pH 7 will give a satisfactory permanent waving solution." It points to McDonough's contribution to the commercial production of thioglycollic acid in 1940. It stresses tests and experiments made between 1935 and 1941 with various mercaptan solutions of various pH contents. All the defendant's proofs on this issue we have examined and find wholly without serious challenge to the holding below. Proof that McDonough in 1935 tested cysteine in a pH 7 solution noting a satisfactory result, and that McDonough was a "pioneer" in the

5. That Speakman's Canadian Patent was not printed and that his U. S. Patent 2,-261,094 did not issue until after McDonough's application date are incidents not affecting their relevance and competence to prove the contemporaneous existence of a commercial practice.

mercaptan-hair-waving field, and proof of his experiments in the 1935–1941 period, falls far short of demonstration that prior to his application date McDonough had discovered that the broad genus of mercaptans were suitable for hair waving only in solutions having an alkalinity of less than pH 10. The defendant in its brief asserts that in 1937 McDonough's first cold waving test with thioglycollic acid and ammonia in a pH 8.9 solution having a 6% concentration "was a reduction to practice of the very composition covered by Claims 17 and 18." But proof of a test with a specific waving agent at a specific pH and at a specific percentage of concentration is hardly a reduction to practice of the broad range of waving agents in the broad areas of concentrations and pH's specified in Claims 17 and 18, respectively. Moreover, since the defendant itself argues that the claims are narrower than the disclosed invention, it cannot consistently urge that a test within the limits of the claims constitutes a reduction to practice of the broader invention which it insists is disclosed in the specifications. It is the date of *that* discovery which operates as McDonough's "invention" date,—not the date on which a successful test was made with a single mercaptan solution within the disclosed pH limit. It is asserted that early in 1941 a series of tests had been made in which McDonough reported "pH seems best about 8–9." Certainly that comment was inadequate to show that McDonough then had in mind pH 10 as a top, critically, limiting factor. Nor does the March 1941 preliminary draft of his patent application definitely indicate that even then his invention had been completed. This document says the mercaptan solutions "are most effective when the pH range is 7.5 to 9.5." It goes on to say that this range "is particularly critical" in cold waving, and that "pH's higher than 9.5 must be watched very carefully and with pH of 10 or above hair destruction * * * occurs." A comparison between the language quoted from this document and that of the application as filed on June 16, 1941, suggests that as late as March 1941, McDonough's conception of his invention was still in process of change. After weighing all the evidence to which the defendant particularly points as supporting a prefiling date against the evidence summarized by the Master and Judge below which looks the other way, and having in mind that the burden was on the patentee to prove a pre-filing date by clear and convincing evidence, United Shoe Machinery Corp. v. Brooklyn Wood Heel Corp., 2 Cir., 77 F.2d 263, we sustain the finding that the defendant has not proved a pre-filing date of invention.

### Lack of Invention

Having found, rightly we hold, that McDonough was not entitled to a pre-filing invention date, the court below held that the McDonough claims lacked patentable invention over Maeder's Australian Patent No. 17990/34, issued on March 7, 1935 on an application dated June 13, 1934; Pye's U. S. Patent No. 2,183,894, issued on December 19, 1939 on an application dated July 26, 1937; the first Speakman U. S. Patent No. 2,201,929, issued May 21, 1940 on an application dated December 6, 1935; the Second Speakman U. S. Patent No. 2,261,094, issued on October 28, 1941 on an application dated December 9, 1935; Speakman's Canadian Patent No. 365,290, issued on April 6, 1937 on an application dated December 10, 1935; and over the depilatory art including U. S. Patent No. 2,352,524 to Evans and McDonough, issued June 27, 1944 on an application dated June 20, 1938.

We think the defendant is right in its insistence that the Second Speakman patent, which did not issue until after McDonough's filing date, should not be treated as part of the prior art for purposes of determining the issue of patentable invention in McDonough's claims. Old Town Ribbon & Carbon Co. v. Columbia R. & C. Mfg. Co., 2 Cir., 159 F.2d 379; Comolite Corp. v. Davidovicz, 2 Cir., 111 F.2d 121; Stelos Co. v. Hosiery Motor-Mend Corp., 2 Cir., 72 F.2d 405. However, even if the court

below erred in treating that as a prior art patent, the error is of no moment because Speakman's Canadian Patent No. 365,290, which issued on April 6, 1937 on an application filed December 10, 1935, *was* part of the prior art and just as clearly as Speakman's Second U. S. patent, disclosed in its specifications the use of cysteine hydrochloride as a waving agent in a pH 8 solution, which in reaction to the natural acidity of the hair, might be expected to drop to pH 6; and also that optimum results are obtained when the solution is either pH 6, or 10, or above. The defendant now contends that Speakman's Canadian patent was not a prior art reference because it was typewritten—not printed. That contention we think untenable. Sirocco Engineering Co. v. B. F. Sturtevant Co., 2 Cir., 220 F. 137. Cf. Trico Products Corp. v. Delman Corp., 8 Cir., 180 F.2d 529.

We think it rightly held below that in view of Pye it involved no patentable invention over Speakman's first U. S. patent and Speakman's Canadian patent, to "discover" that to prevent hair damage a mercaptan waving agent must be used in a solution having an alkalinity not in excess of pH 10. For Pye had taught that permanent waving is accomplished by a swelling of the hair fibres, "the swelling being proportional to the pH of the solution," and that a solution causing excessive swelling "approaches that of a depilatory." His claims include solutions having a pH range of from 8 to 11. More specifically he taught "that alkali metal sulfides and organic sulfides when adjusted in pH to below 11, will soften the hair * * * without excessive swelling" and that "though the minimum pH, required for stability of most of the solutions of this invention, is between 9 and 9.5, this is entirely a characteristic peculiar to the individual compound used." Whether Pye disclosed the use of mercaptans as waving agents

was the subject of conflicting testimony below which was resolved below by a finding in favor of the plaintiffs, with the result that Pye was found to completely anticipate the claims in suit. However, for the impact of Pye on the issue of patentable invention, we will assume that Pye's discovery did not include the use of mercaptans as waving agents but related only to sulfide solutions. Even so, however, we think it was rightly held below that the claims in suit lacked patentable invention over Speakman's first United States patent (which disclosed cysteine hydrochloride as a waving agent) and over his Canadian patent (which disclosed cysteine hydrochloride in a pH 8 solution as the waving agent), in view of Pye who disclosed a sulfide solution with a pH range of 8 to 11 and taught that hair damage could be avoided by lowering the pH of the solution.[6]

However, the holding below did not rest solely on the lack of McDonough's advance over Speakman plus Pye. For there was evidence that the permanent waving art and the depilatory art were at least closely analogous if not part and parcel of a single art. Fletcher's French Patent No. 824,804, published February 17, 1938, disclosed a depilatory compound consisting of a mercaptan adjusted to a pH value not lower than 10, thus, like McDonough, teaching that mercaptan solutions at pH 10 and above will cause depilation, or hair damage. A similar disclosure was contained in Bohemen's British Patent No. 484,467, granted April 27, 1938. We conclude, therefore, that even on the assumption—contrary to fact, as we hold,—that McDonough's disclosure of criticality in the use of mercaptans in solutions having a pH range of 7 to 10 disclosed a limitation which was critical in fact, the holding that the claims lacked patentable invention over the prior art disclosures of Pye, the first Speakman patent, and Speakman's Canadian patent derives ad-

---

6. It will be noted that in so holding we have assumed that both limits of McDonough's pH range of 7 to 10 are critical. The holding is even more imperatively required if we are right in our prior holding that neither limit was in fact critical.

ditional support in the prior art disclosures of the depilatory patents of Fletcher and Bohemen.

### Anticipation

The plaintiffs contend, and the court below held, that the patent in suit was anticipated by each of the following references: Speakman's Second U. S. Patent, Speakman's Canadian Patent, the Pye Patent, the Evans and McDonough U. S. Patent No. 2,352,524, issued on June 27, 1944 on an application dated June 20, 1938, the Leavell and Ellis article on colorimetric analysis published in "Industrial and Engineering Chemistry" in 1934, and specific prior uses made by Martin and Grant in 1941. Our ensuing comment on these rulings will still proceed on the assumption that McDonough's application had disclosed that a limitation of mercaptan solutions as to those having a pH range of 7 to 10 was critical and that the limitation was in fact critical.

■ Both Speakman's Second U. S. Patent and the Evans and McDonough Patent did not go to issue until after the filing date of the patent in suit. On that account they could not be held to constitute part of the prior art or as anticipating patents under 35 U.S.C.A. § 102(a). Nevertheless, they were anticipatory under the doctrine of Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651, now codified in 35 U.S.C.A. § 102(e). Old Town Ribbon & Carbon Co. v. Columbia R. & C. Mfg. Co., supra; Stelos Co. v. Hosiery-Mend Corp., supra. The defendant does not challenge the findings below that a portion of each of these patents falls within the area of McDonough's alleged invention. It bases its attack on the anticipatory effect of these patents upon its contention that McDonough is entitled to a pre-filing date of invention. That attack falls with our holding, already indicated, to the contrary.

■ In connection with Speakman, the defendant also contends that the scope of the Alexander Milburn doctrine, and of 35 U.S.C.A. § 102(e), does not encompass anticipatory material contained in patent *claims* but is restricted to matter disclosed in the *specifications*. That contention is in direct conflict with the Alexander Milburn opinion, as construed by our decision in Old Town Ribbon & Carbon, supra. Moreover, as was rightly found below, the anticipatory material in Speakman was not confined to his claims: Speakman in the specifications of his original application disclosed the mercaptan, cysteine hydrochloride, at pH's of 6, 8 and 10 as waving compositions.

■ The defendant further contends that the Evans and McDonough patent is not an available anticipatory reference because the application by Evans and McDonough, as joint inventors, was not an application by "another" (i. e., other than McDonough) within the meaning of § 102(e).[7] This contention the court below overruled. That decision, in so far as we have been able to ascertain, is one of first impression in this or any other circuit and, especially in view of the policy considerations involved, we are reluctant to commit this court to that interpretation of § 102(e) unless the holding is needed for the disposition of this case. We see no such need. For if we were to hold that the Evans and McDonough patent is a patent of the *same* inventor, we should be constrained to hold that the patent in suit was void for double patenting. Miller v. Eagle Manufacturing Co., 151 U.S. 186, 14 S. Ct. 310, 38 L.Ed. 121; Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co., 2 Cir., 22 F.2d 259. The Master's

---

7. 35 U.S.C.A. 102. *"Conditions for patentability; novelty and loss of right to patent.*

"A person shall be entitled to a patent unless—

\* \* \* \* \*

"(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, \* \* \*."

acute and accurate reasoning on this problem, which we quote in a footnote,[8] inescapably leads to that conclusion. With the defendant thus placed between the two horns of a dilemma, there is no need for us now to say which carries the *coup de grace*. One horn or the other is fatal.

Speakman's Canadian Patent which, as we have held, was part of the prior art, reads directly on the patent in suit. This is so even if McDonough's disclosed range limits of pH 7 to 10 were in fact critical since the Canadian Patent discloses solutions of pH 8. Its anticipatory scope is even greater if, as we have held, either of McDonough's pH range limits is not critical in fact. For the Canadian Patent also discloses mercaptan solutions of "about pH 6" (Claim 3), of "about pH 4" (Claim 5) and of "pH 10 or more" (Claim 4). We therefore hold that Speakman's Canadian Patent, as well as his Second United States Patent, anticipates.

We also affirm the holding of anticipation by prior uses by Grant and by Martin, each of whom as early as March 1941 had reduced to practice at least one mercaptan waving solution having a pH falling within McDonough's pH range of 7 to 10.

Whether the disclosures of the Pye patent and of the Leavell and Ellis publication on colorimetric analysis were, each in itself, adequate to constitute anticipations, as was held below, we have considerable doubt. These questions, as well as that of anticipation by Evans and McDonough, we pass since we prefer to place our dispositive rulings as to anticipation on the other references indicated above which seem to us to provide a more solid foundation for our judgment.

### Invalidity on Other Grounds

The court below, on the Master's recommendation, overruled the plaintiffs' contention that the claims in suit were void for inoperativeness and for the inclusion of new matter not included in the applicant's disclosure. Those rulings we affirm on the opinion below.

The court below also ruled that the claims were void for indefiniteness. This ruling we also affirm. We will, however, somewhat amplify the reasoning relied on below by the following observations. The range limits of concentration and of pH stated in the claims, notwithstanding the lack of precision with which the limits were stated, were distinctly narrower than the critical limits of the invention which the defendant claims to have disclosed in the specifications. As we have already observed in connection with our discussion of criticality, the applicant if he wished

---

8. "Plaintiffs also contend that the permanent waving patent is invalid because of double patenting, i. e., issuing two patents for the same invention to the same assignee. While plaintiffs do not press this point vigorously, the Board of Appeals in the Patent Office so held and there is indeed much merit in the argument. Aside from preferences which are expressed in the specifications, the claims of the two patents do overlap and there is definitely a double patenting of compositions falling within the area of overlap. Defendant urges, however, that the compositions specified in the claims of the depilatory patent are necessarily different because the claims call for concentrations of mercaptans sufficient to render the hair removable after contact therewith, whereas none of the compositions falling within the ranges specified in the claims of the permanent waving patent will cause removal of the hair. This is so, it is to be supposed, because the claims of the permanent waving patent require the concentration and pH of the composition to be adjusted so as to obtain 'a permanent change in the configuration of the hair during a given time of application without damage to the hair structure.' But double patenting cannot be avoided simply by defining the compositions in terms of function if in fact the compositions claimed in one are the same as those claimed in the other. Moreover, as the tests in the record show, McDonough's permanent waving compositions, if left on the hair for a sufficient length of time, will depilate. And since the critical factor of time is nowhere defined in McDonough's claims, defendant can derive little comfort from the functional distinction on which it relies."

was entitled to claim a monopoly narrower in scope than that of his full disclosure and thereby abandon to the public so much of his invention as lay outside his stated claims. That is what the defendant insists was done. However, because this was done the requirement of the Act for definiteness in the statement of claims must be strictly construed. In the ordinary case, in which the intended scope of the claims is commensurate with the scope of the disclosure, any peripheral uncertainty as to the claims can be clarified by reference to the application. Not so, however, when the claims are concededly narrower than the disclosure, as here. Confronted with claims such as these, a member of the public is left at his peril to guess just where the applicant has drawn the line between his claimed monopoly and the public domain. We think the facts that the applicant himself and the defendant's expert witness were in disagreement as to the meaning of the limits of the claims as stated, and that there were several commercial compositions falling within the peripheral area of uncertainty, were significant.

Especially in the light of this consideration, we think the holding of indefiniteness is required.[9] Claim 18 may be thought to be the narrowest and most definitely stated of all the claims. Let it be granted that the limitation in Claim 18 to a "solution having a pH higher than pH 7 and not higher than pH 9.5" is sufficiently definite. But what is meant by the concentration limit of "about 6%"? Having in mind that the specifications do not teach, and the defendant does not claim, that there is anything critical about a 6% concentration, does this mean that compositions which in other respects would infringe Claim 18 are abandoned to the public if their concentration is somewhat above or below 6%? If so, why did not the applicant state 6% without the qualifying

word "about"? The very use of the qualification imports that the limitation suggests some *range* of concentration. But nothing in the four corners of the patent defines that range. And the holding of indefiniteness even more conclusively applies to the other claims in all of which (2, 12 and 17) both the pH range limits and the concentration range limits are stated with similar ambiguity. We do not, of course, go so far as to hold generally that claims defining range limitations with some degree of approximation are in all cases fatally indefinite. Our holding here relates to limitations on claims which are narrower than the invention disclosed in the specifications and which purport to assert a private monopoly of compositions falling within a known chemical genus.

In affirming the holding of indefiniteness, we think it unnecessary to rule upon the impact of the so-called adjustment clause which is contained in these claims or the conflicting positions of the parties as to whether the claims now before us fell within the scope of the Master's conclusions as to the effect of the adjustment clause. Even were these problems resolved in accordance with the defendant's contentions, we should adhere to our holding that the claims are fatally indefinite.

Being abundantly satisfied that the claims in suit are invalid for lack of criticality and invention, for anticipation, and for indefiniteness, we shall not discuss or rule upon the findings of infringement made below.

### DEFENDANT'S COUNTERCLAIM AGAINST HELENE CURTIS

 Also referred to the Master and dealt with by him and the court below was the defendant's counterclaim against Helene Curtis, one of the plaintiffs herein. On this counterclaim the defendant sought recovery of large damages claimed to have been caused by the act

9. Standard Oil Co. of California v. Tide Water Associated Oil Co., 3 Cir., 154 F.2d 579, 581–586; Libbey-Owens-Ford Glass Co. v. Celanese Corp. of America, 6 Cir., 135 F.2d 138, 144–145. Cf. Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 324 U.S. 320, 329, 65 S.Ct. 647, 89 L.Ed. 973.

of Helene Curtis, through its agent, Grant, by filing on April 4, 1948, in the Patent Office, while the defendant's Mc-Donough application was pending therein, a "protest" against the grant of a patent thereon containing deliberate and malicious misrepresentations of fact tending to show that the McDonough application was not patentable. The counterclaim further alleged that, because of this protest, on June 16, 1948 the Examiner "withdrew his previous allowance of claims in said application, reversing his holding of patentability of subject-matter therein without citing any new prior art or new grounds for rejection, and finally rejecting all claims therein which covered any composition or method then or now being made, used or sold by Defendant or by Plaintiff." Because of this malicious or intentional conduct on the part of Helene Curtis, the defendant in its counterclaim further alleges that the defendant was "put to extraordinary delay and expense in the further prosecution of said patent application, including exceedingly expensive and prolonged research to develop technical data and evidence to refute the position taken by said Examiner on and after June 16, 1948" and including unsuccessful prosecution of an appeal to the Board of Appeals of the Patent Office and prosecution to final judgment in favor of the defendant of a § 4915, 35 U.S.C.A. §§ 145, 146, suit. This delay in the issuance of its patent, it was alleged, in addition to the expense of research and litigation, caused the "loss of royalties and other damages." [10]

The court below found that the defendant had failed to prove that the protest, which concededly Helene Curtis filed through Grant, contained actionable misrepresentations of fact or that

it was the cause of damage to the defendant. Since our study of the voluminous record satisfies us that there was inadequate proof of any causal connection between the plaintiff's protest and the defendant's alleged damages, we affirm that finding and shall not extend our discussion beyond that issue.

Prior to the filing of this protest, there was nothing in the record to show that the application had been either formally allowed or informally indicated as allowable. On the contrary, after the application had been twice rejected the applicant had on August 3, 1945 submitted a proposed amendment and affidavits, and on August 13, 1945 filed an appeal to the Board of Appeals. On June 14, 1946, the Examiner mailed to the applicant a notice of advisory action on the proposed amendment of August 3, 1945 indicating no change in his conclusion that the application was unpatentable. Thereafter, on September 10, 1946, apparently for purposes of the appeal and in alleged response to the advisory action of June 14, 1946, the applicant filed an amendment wherein he canceled all claims and substituted Claims 68 to 88, inclusive, with 105 pages (as measured in the File Wrapper) of additional affidavits and supporting argument. On February 12, 1947, the Examiner notified the applicant by letter that his Claim 88 was in interference with Claim 40 in a co-pending application of one Martin and that his "claims 68 through 87 will be held subject to rejection as unpatentable over the issue in the event of an award of priority adverse to the applicant." On June 16, 1947, applicant moved to dissolve the declared interference on the ground that the interference count (which was identical with his own Claim 88) was "unpatentable for the

10. The defendant also filed a counterclaim against the Gillette Company. However, as the Master noted, this counterclaim was wholly unsupported by evidence and on his recommendation it was dismissed by the court below with the comment that "it was abandoned in fact, if not formally." This ruling has not been raised as a ground of appeal. It is of interest only for the side-light which it throws on the tactics of the defendant who complains that Helene Curtis caused it additional expense in prosecuting its application in the Patent Office and yet put Gillette to the expense of preparing a defense to a counterclaim which it supported by no evidence whatever.

reason that it is vague and indefinite" and not supported by the applicant's disclosure. In response to this motion, on December 9, 1947, the Examiner dissolved the interference *"pro forma* as to the original count on interference" but, stating that "there is undoubtedly a common invention involved," suggested a new count in interference, designated as "Count E." On December 17, 1947, applicant moved that the Examiner strike from his ruling of December 9, 1947 "his suggestion of a new count based on common inventive subject-matter in the two interfering applications and his comment that an issue of priority thereon is considered 'essential'." This motion the Examiner denied on December 30, 1947. After an unsuccessful motion to the Primary Examiner for a dissolution of the interference, the applicant on February 7, 1948 addressed a petition to the Commissioner to direct the Primary Examiner to strike Count E suggested as being in interference with Martin's application. All this, it will be observed, occurred prior to Grant's "protest." ·

Thereafter, under date of June 16, 1948, the Commissioner referred the applicant's prior petition to the Examiner "with discretion to consider anew his suggestion of the count proposed by him." The Examiner then in response to applicant's motion of February 7, 1948 withdrew his proposed Count E "as being unpatentable for lack of invention" and dissolved the interference. On June 16, 1948, the Examiner mailed to the applicant a response to his amendment of September 10, 1946. In this action, Claim 88 was rejected, as well as other specified claims, "as being drawn to non-elected species"; all claims were stated to stand rejected "as being unduly multiplied," as had been indicated in prior Office actions; and also consistent with prior Office action all other claims were rejected as lacking invention over specified references except Claim 82 which was held to be amendable.

The defendant by brief asserts that the proofs show that prior to Grant's protest the "examiner had withdrawn his rejection of McDonough claims and had held the subject-matter of the application to be patentable." We find in the record no evidence whatever to support this assertion. Certainly it is directly contrary to all Office actions, as appears from the foregoing résumé of the file wrapper. It is true that in his remarks appended to its Amendment of September 7, 1948, the defendant's counsel asserted that its prior amendment of September 10, 1946, "was entered after interviews on September 5 and 6, 1946, at which time the Honorable Examiner stated informally that he considered the claims to be allowable." But we find no support for this self-serving assertion either in the pretrial depositions of the Examiners which are in evidence or elsewhere in the record. And the Board of Appeals in its opinion on a petition preliminary to the hearing of the defendant's appeal on the merits said: "The allegations of appellant that all of the claims in the case were allowable and the case put in condition for issue by the entry of the amendment of September 10, 1946, are without basis in fact. The record unequivocally shows that all the claims were never allowed. Appellants' assertions to the contrary are without weight." They are without weight with us also.

The defendant further seeks to buttress his assertion that prior to the protest the claims had been found to be in an allowable state by arguing that the interference with Martin declared on February 12, 1948, and the subsequent motions and rulings thereon, necessarily so imported: absent allowable claims there would have been no occasion for interference proceedings,—so the argument runs. But certainly the fact that Claim 88 was thought to be in interference carried not the slightest implication that the Examiner considered all the other, non-interfering, claims to be allowable.

Even if the Examiner, when he declared the interference with Claim 88, had considered that claim to include pat-

entable matter we see not the slightest ground for inference that his subsequent action as to Claim 88, any more than his subsequent action on the other claims, had been affected by Grant's protest. The defendant in its motion to dissolve the interference had conceded that Claim 88 was unpatentable for its vagueness: the Examiner rejected it on the ground that it was drawn to an unelected species,—a ground of rejection which had been applied in earlier Office actions. We think it preposterous to urge that the defendant's subsequent labor and research activities were caused by the rejection of a claim which it conceded to be unpatentable for vagueness. It is equally untenable to urge that a rejection which was officially predicated on the ground of non-elected species was caused by the alleged misrepresentations in the protest. For the protest was not relevant to the ground of "unelected species." Furthermore, the Board of Appeals in its opinion of May 2, 1949 on the merits noted that Claim 88, and certain other claims, "have been rejected as not inclusive of the elected subject-matter. Since that *rejection has not been challenged,* we need not further consider these claims." (Emphasis supplied.) Thereafter, Claim 88 was not put in issue in the § 4915 suit and was not included in the patent as issued. The defendant's acquiescence, thus indicated, in the official disposition of Claim 88 is in basic conflict with its assertion that its subsequent labor and expense was an effort to undo harm caused by the protest.

We find nothing in the pretrial depositions of the Examiners or in their Office actions and rulings to warrant even a suspicion that they were affected by the protest. Their Office actions were in all respects expressly predicated on other references. We conclude that the expense and damages for which the defendant seeks recovery on this counterclaim were incidental to a persistent and vigorous prosecution of an extraordinarily complex application and not at all caused by Grant's protest. The conclusion makes it unnecessary to consider whether an action lies to recover damages for wrongful interference with the prosecution of an application for a patent which, after issue, is held to be invalid. Whatever may be the correct answer to that question, on the ground above discussed we hold that the record in this case warrants—indeed requires, an affirmance of the dismissal of this counterclaim.

### Validity of Procedure Below

The defendant also presses on appeal a claim of error based on its contention that it was deprived of a fair trial in that it was denied an opportunity to argue orally on the merits before the Master. At the close of evidence, the Master inquired whether counsel wished to submit their arguments on brief or to have an oral argument as well. Counsel expressed preference for oral argument and it was agreed that if there was to be an argument it should be held after the briefs were in. The Master throughout the discussion indicated that he had no preference in the matter and was willing to adopt whatever procedure would suit counsel's convenience. Upon learning of counsel's preference the Master stated: "Very well, then the disposition will be that after the briefs are in, unless counsel change their minds, there will be a day set for argument." The final disposition of the matter as stated by defendant's counsel was: "I suppose the time for oral argument would be something we would agree upon later with the Master," to which the Master replied: "I should rather think so. I think to fix a date for argument beyond the 15th of June (the date reply briefs were to be submitted) is an attempt to foresee the future beyond our capacity."

The main briefs were exchanged on April 30th. Thereafter, a meeting was held on May 14, 1953 at which the Master and opposing counsel were present. As to the understanding reached at this conference on the subject of oral argument there are conflicting recollections. The following facts, however, are undisputed. (a) In the preliminary nego-

164

tiations between opposing counsel arranging for the May 14 meeting counsel for the defendant suggested that they "ascertain, at that time, whether he [the Master] will want oral arguments and try to arrange a tentative date for that." (b) At the meeting, the Master stated that after he had studied the briefs and the record (at that time the reply briefs had not yet been exchanged) he would advise counsel if he, the Master, wanted oral argument on any matter but that this should not preclude counsel from making argument generally or on any points they might wish to discuss. (c) No request for oral argument was made thereafter. (d) The reply briefs were exchanged on June 15, 1953. (e) The Master filed his report on January 13, 1954 without prior communication with the parties. (f) Thereafter defendant's counsel did not assert its desire for oral argument to the Master by petition for reconsideration although he was in communication with the Master as to other matters pertaining to the case. To these undisputed facts defendant's counsel adds his recollection that it was his "*understanding* that, prior to rendering his final written report, the Master would inform counsel whether or not he wished oral argument and that after being so informed it would then be appropriate for either party to request argument if desired" and that he "*indicated* that I would *probably desire* to make an argument for defendant whether the Master or plaintiffs requested same or not."

Considering the importance which the defendant now attaches to the lack of oral argument, we find it difficult to comprehend how counsel would have relied on an "understanding" and an "indication of probable desire" for a period of eight months as a basis for protection of its right to oral argument. The defendant submitted a total of 456 printed pages of briefs before the Master and never after the May 14 meeting gave any indication by formal request or otherwise that it was demanding an oral argument. Nor does it now assert that it was denied an opportunity to present to the Master any arguments not contained in its briefs.

Moreover, in addition to failing to request an oral argument by petition for reconsideration before the Master, defendant's counsel omitted to argue the point either orally or by brief before the District Court.

Taking into consideration all of the foregoing factors and the admonition of the Supreme Court to decide the necessity of oral argument as a requirement of procedural due process on a case-to-case basis, Federal Communications Commission v. WJR, etc., 337 U.S. 265, 274–277, 69 S.Ct. 1097, 93 L.Ed. 1353, we hold that the defendant has been accorded all the requirements of a fair and proper trial.

### DENIAL OF DEFENDANT'S MOTION FOR NEW TRIAL

After the appeals herein had been docketed, the defendant obtained permission of this court to file below a motion for a new trial on the ground of newly discovered evidence. This motion was denied below and that ruling is now before us on appeal.

The evidence on which the defendant based its motion was a patent application Serial No. 222,527, filed April 23, 1951 in the United States Patent Office by A. E. Brown, the patent on which issued to the plaintiff Gillette, as assignee, on September 14, 1954. Until that date application Serial No. 222,527 was not available to the defendant's inspection in the United States Patent Office. However, a certified copy of said application had been filed in the Patent Office of the Union of South Africa in support of an identical application for a patent which Gillette, as Brown's assignee, had filed in that office on March 31, 1952, upon which a patent was granted to Gillette as such assignee by the Union of South Africa on October 20, 1952. The Official Journal of Patents of South Africa of April 9, 1952 and November 5, 1952 showed, respectively, the filing of the application and the granting of the patent thereon (No. 14869) to Gillette as

Brown's assignee and that the subject-matter was "Improvements in or Relating to Hair Waving Compositions." These issues of the South African Journal of Patents were received in the United States Patent Office on June 4, 1952 and December 8, 1952, respectively. We have no reason to question the assertion of the defendant's counsel that this South African application did not come to his attention until December 1954. But from an uncontradicted affidavit of the plaintiff it appears that the evidence on which the new trial was sought was a patent application the existence, ownership and subject-matter of which a counterpart had been published to the world, and notice whereof had been on file in the United States Patent Office before the presentation of evidence to the Master in the case below had been concluded.[11]

Brown, the applicant of U. S. Serial No. 222,527, had testified as an expert witness for the plaintiffs in the trial below. The new trial was sought to afford defendant an opportunity to impeach the testimony which he there gave and also to show an alleged and wrongful suppression of evidence by Brown and by a Gillette executive, one Reed, who had testified in a pretrial deposition.

In its motion addressed to this court for permission to file its motion for a new trial, the defendant refers to numerous extracts from Brown's application which were thought to be inconsistent with Brown's testimony on trial. But a careful study of the plaintiffs' memorandum and affidavits in opposition make it clear that many of the claimed inconsistencies are due to the defendant's use of incomplete extracts or to meanings inconsistent with the context. As a result most of the alleged inconsistencies disappear like snow under a March sun. Even the defendant in its reply shifts

its position as to most of these claimed inconsistencies: instead of persistence in a contention that passages in Brown's application were necessarily inconsistent with Brown's testimony below it repeatedly asks in various forms, "What tests were performed to ascertain the truthfulness of this statement?" in the Brown application, thereby insinuating that such tests, if they had been put in evidence might have been helpful to the defendant's case on the merits. Of course, after the evidence had closed and judgment had been entered, the defendant was not at liberty to embark on a fresh fishing expedition in the hope that evidence of tests made in connection with Brown's application might disclose information tending to support its position as to the patent in suit.

For such an effort there was no basis in the pretrial examination of Mr. Reed who, the defendant charges, by his testimony intentionally suppressed evidence as to tests which Gillette had made. The defendant's charge of "untruthful testimony" and "wilful suppression" of evidence, as made in his motion to remand, was based on Reed's negative answer to a question by defendant's counsel as to whether he had made experiments in his work *specifically directed* at determining the criticality of pH with cold waving solutions, mercaptans." That answer we find wholly consistent with Brown's No. 222,527 application which was predicated not at all on the criticality of any pH range or indeed on the criticality of any of the factors involved in the patent in suit. The defendant, in its reply memorandum, charged that to give Reed's answer what we find to be its plain meaning (which the transcript shows the Master to have fully understood) was "to indulge in semantic quibbling." This charge is conclusively disposed of by Reed's testimony immediate-

11. The Australian Official Journal of Patents of May 8, 1952, received in the United States Patent Office on August 28, 1952, gave notice that a corresponding patent application had been filed in the Australian Patent Office on April 22, 1952 by Brown and Gillette as assignee for a hair waving composition, and the Australian Journal of June 29, 1952, which was received in the United States Patent Office on August 1, 1952, disclosed that the complete application had been laid open to public inspection.

ly preceding the extracts which the defendant quoted, wherein the witness made it abundantly clear that over a period of time, in a belief based on broad research exploring pH ranges with various mercaptans, he had come to the conclusion that there was "nothing critical in the pH value of 10 in thioglycolate solutions for cold hair waving" and being of that conclusion had "never conducted a series of experiments exclusively aimed at the answer to that question." Thus the witness had not suppressed, but rather, proclaimed the existence of prior research work and there is nothing to show that the defendant ever demanded to see or that the plaintiffs refused to produce, any records made of such research. If there has been any semantic quibbling connected with the charge of suppression it can only be that defendant's counsel was the author.

·The defendant, in its reply to plaintiffs' affidavits in opposition, did, however, persist in claiming that the following paragraph from Brown's application is inconsistent with Brown's testimony and the plaintiffs' position in the trial.

> "My invention is particularly striking in its effects as demonstrated in relation to the thiol cysteine. This compound, used in concentrations and at pH values which are both safe and commercially feasible, does not provide an acceptable wave; indeed, at room temperature it shows so little waving activity that for all practical purposes it is valueless for home waving. Upon the addition of a few mols of urea, however, the composition becomes substantially as effective as the conventional ammonium thioglycolate compositions."

This is the most plausible and, for its impact on the merits, the most serious claim of inconsistency upon which the defendant bases its motion for a new trial. But Brown's testimony in the trial, which the defendant now seeks to impeach, was directed to the issue of criticality. And defendant's contention that the materials in Brown's application constituted impeachment of his testimony and admissions against the plaintiff Gillette rests on his further contention that criticality may be measured by commercial superiority. Having rejected that contention we find no irreconcilability between Brown's testimony at the trial and his application for the patent in question.

Moreover, we think the surface suggestion of inconsistency largely evaporates in the light of Brown's answering affidavit in which he points out that he was there speaking of the *safety* and the *commercial feasibility* of cysteine and its *practicability* for cold waving in the home. He alleges in his affidavit, without contradiction, that cysteine is a vastly more expensive ingredient than other mercaptans and also than urea. That it was a weaker reducing agent than other mercaptans and, consequently, was correspondingly effective only in higher concentrations was in line with his evidence at the trial. Also at the trial he had testified to the toxic effect on the scalp of highly alkaline solutions,—an effect independent of hair damage from solutions of excessive pH content. We think it obvious that especially for home waving an inexpensive solution is a factor making for commercial success. In the light of these considerations, we do not think that his testimony on trial would be seriously impugned by the statement in his application which, as we confidently interpret it, went no further than to say that a cysteine solution of a pH low enough to be safe from toxic effects on the scalp and of a concentration high enough to give a satisfactory cold wave under home conditions would be too expensive for commercial success,—a difficulty which could be mitigated by his proposed addition of urea to the solution.

 ██ We cannot believe that the inclusion of such tenuous "impeaching" material in the record on the merits would have changed the ultimate conclusions of the Master or the Judge below. Especially is this so since their conclu-

sion of "invalidity" was based also on grounds other than lack of criticality to which alone this desired impeachment seems to be relevant. And we can with even greater confidence say that the inclusion of Brown's application and patent in the basic record if the case were reopened to permit its receipt into the evidence would not, in view of all the proofs, affect our ultimate holding on the merits. We conclude, therefore, that in denying the motion for a new trial, there was no error. The matter was concededly within the discretion of the trial judge. Certainly no abuse of discretion was shown. Indeed, we think that on the merits of the motion his discretion was wisely exercised.

We will add—although the conclusion just stated is not dependent on this additional observation—that we think the motion was not seasonally made in view of the facts recited above relating to Brown's South African application and patent and the notices contained in the South African Journal of Patents. In one aspect, it is indeed harsh to charge the defendant with lack of diligence for its failure earlier to discover the allegedly impeaching material of this patent and its underlying application. But absence of knowledge by an inventor of the existence of an earlier patent will not save him from its anticipatory effect; and when a defendant, charged with infringement, is preparing his defense he must make his search for anticipatory patents in season to present them at trial. To relieve either the inventor or the infringer of these requirements would vastly add to the already great uncertainty as to the validity of outstanding patents: it would open the door to patent litigation on an interminable piecemeal basis. The same results will follow if after trial an infringer whose defense of invalidity has been overruled is given opportunity to reopen the case for the presentation of after discovered anticipations or if after trial a patentee whose patent has been adjudged invalid can reopen his case to present after discovered patents for material thought either to support his own position or to destroy or weaken his adversaries' position.

The closest question involved in defendant's motion to obtain a new trial, in our opinion, is raised by the plaintiffs' request that we impose upon defendant plaintiffs' costs and counsel fees incurred in defense of the motion. We agree with plaintiffs' counsel that the charges of false testimony and wilful suppression of evidence were serious and wholly unsupported by the showing made, and that most of the claims of inconsistencies were without substance. They were inexcusable in the sense that they were wholly unnecessary to the effective presentation of such merit as the motion could reasonably be thought, even by a partisan advocate, to have. Nevertheless, we cannot say that there was no ground for making the motion: we think it not unreasonable that the defendant should have thought that the paragraph quoted above from Brown's application might have some impeaching effect on his testimony. On the whole, we think the request to tax plaintiffs' counsel's fees against the defendant should be denied. Their printing costs will, of course, be taxed in their favor in the usual course.

Affirmed.